## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

PHOENIX ENTERTAINMENT PARTNERS, LLC, a North Carolina LLC,

        Plaintiff,

v.

GOODTIME CHARLIE'S, INC. a Florida Corporation

        Defendant.

Case No.: _____

## COMPLAINT AND JURY DEMAND

Plaintiff, Phoenix Entertainment Partners, LLC ("PEP") complains of Defendant Goodtime Charlie's, Inc. ("Goodtime") and for its Complaint hereby alleges as follows:

### JURISDICTION AND VENUE

1.     This is an action for trademark infringement and unfair competition arising under §§ 32 and 43 of the Trademark Act of 1946, 15 U.S.C. §§ 1114 and 1125. This Court has exclusive jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws of the United States.

2.     This Court further has jurisdiction pursuant to 28 U.S.C § 1338(a), in that this civil action arises under an Act of Congress relating to trademarks, and, as to PEP's Lanham Act unfair competition claim, pursuant to 28 U.S.C. § 1338(b), in that the claim is joined with a substantial and related claim under the trademark laws of the United States.

3.     This Court has supplemental jurisdiction over the subject matter of PEP's state law claim pursuant to 28 U.S.C. § 1367(a), in that the claim is so related to PEP's federal claims that they form part of the same case or controversy.

4.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because Defendant Goodtime transacts business in this judicial district.

5.     This Court has personal jurisdiction over Defendant, in that Defendant conducts significant business in this State and federal judicial district, and the acts and events giving rise to this lawsuit of which the Defendant stands accused were undertaken in this State and federal judicial district.

## THE PLAINTIFF

6.     Plaintiff PEP is a North Carolina LLC having its principal place of business in Pineville, North Carolina.

## THE DEFENDANT

7.     Defendant Goodtime Charlie's, Inc., is a Florida Corporation that operates an establishment called Good Time Charlie's Pub, with its principal location at 4030 West Waters Avenue, Tampa, Florida 33614.   Goodtime operates a commercial establishment that provides karaoke entertainment to its patrons as an inducement for their patronage and purchase of food, drink, and other concessions.

## BACKGROUND FACTS

8.     Karaoke is a popular form of participatory entertainment commonly found in bars and restaurants and other types of venues throughout the United States.

9.      The basic premise of a karaoke show is that the venue hosting the show provides patrons with access to a sound system and specially prepared karaoke accompaniment tracks, so that individual patrons may perform for the crowd.

10.     Generally, a "karaoke accompaniment track" is a re-recorded version of a popular song without the lead vocals in a specialized format that includes a graphical component containing a lyric display, cueing information, and other information. The graphical component is synchronized to the music and is displayed to the patron who is performing and, typically, to the crowd as well.

11.     Venues that offer karaoke entertainment do so primarily as a free service, but with the commercial purpose of enticing patrons to come to their establishments and purchase food and beverages.

12.     The purchase and consumption of alcoholic beverages in connection with karaoke shows is particularly encouraged to enable patrons to overcome inhibitions against singing in public.

13.     PEP is the owner of Sound Choice, a well-known and leading brand of karaoke accompaniment tracks that is particularly well known to commercial karaoke operations including bars, restaurants, and other venues as described above.

14.     PEP has succeeded Slep-Tone Entertainment Corporation ("Slep-Tone"), by assignment, in all interest in the Sound Choice brand.

15.     Over the course of nearly three decades in business, Slep-Tone re-recorded and released in excess of 16,500 Sound Choice-branded popular songs on special compact discs known as CD+G ("compact disc plus graphics") discs and, more recently, a subset of that catalog in another common karaoke format, MP3+G ("MP3 plus graphics").

16.     Sound Choice-branded karaoke tracks are wildly popular among karaoke entertainment providers, patrons, and home consumers.  According to some estimates, more than half of all accompaniment tracks played at karaoke shows in the United States originated from Slep-Tone's recordings.

17.     The popularity of Sound Choice karaoke tracks derives from the market's perception that the recordings are usually the most faithful to the sound of the original recording artist, a characteristic highly valued by karaoke singers.

18.     Sound Choice karaoke tracks are also perceived by the market as providing highly accurate singing cues as part of the video display, a characteristic that is also highly valued by karaoke singers.

19.     Slep-Tone and its successor PEP have released their karaoke tracks for commercial users <u>only</u> on compact discs[1] and not on any other form of carrier (such as computer hard drives or through internet downloads).

20.     Over time, however, it has become technologically possible to create karaoke accompaniment tracks, using the Sound Choice CD-based tracks as a template, for storage on alternative media, such as computer hard drives.

21.     In most cases, the creation of such non-original tracks results in an imitation of a Sound Choice track, which imitation is inferior to the original because of digital compression of the data as the format is converted from native CD+G audio and graphics to compressed audio and graphics.

22.     In a typical bar or restaurant environment, because the imitation tracks still bear the Sound Choice trademarks, when the tracks are used, the Sound Choice trademarks are

---

[1] In the beginning, Slep-Tone released its karaoke tracks on cassette tapes as well, but that technology was focused on the home consumer and has since become fully obsolete.

broadcast or published to the general public or specific market segment to advertise the establishment's goods, products or services for the purpose of attracting customers or supporters.

23.    In a typical bar or restaurant environment, patrons are often unable to distinguish the imitation from an original, provided that the compression is not too aggressive, because the goal is to produce an acceptable digital substitute.

24.    The process outlined above is known as "media-shifting," because the information is being copied or shifted from one medium to another, and "format-shifting," because the information is being copied or shifted from one format to another.

25.    Media-shifting and format-shifting are undertaken for a number of purposes, some reasonable and others illicit.

26.    Users of karaoke accompaniment tracks usually find that the use of media-shifted tracks provides them with greater ease of use of the content, which can be stored on a hard drive and accessed quickly without having to insert discs into a player, and can protect the user's discs from excessive wear, damage, loss, or theft.

27.    Prior to 2007, Slep-Tone prohibited media-shifting and format-shifting of its products entirely, and its products carried warnings against the unauthorized duplication that media-shifting and format-shifting require.

28.    In order to enable legitimate owners of original discs the convenience of format-shifting and media-shifting, starting in 2007, Slep-Tone instituted a policy—which PEP has continued—whereby legitimate owners could gain permission for media-shifting and format-shifting.

29.    That policy requires disc owners to notify Slep-Tone of their intent to media-shift, or that they have completed a media-shift.

30.     That policy also requires disc owners to maintain a condition known as "1-to-1 correspondence" between the discs they own and the media (such as hard drives) to which they media-shift.

31.     For example, a disc owner who wants to have two hard drives with the same media-shifted content must own two original discs representing that content.

32.     The policy also requires disc owners to undergo an audit of their holdings to verify 1-to-1 correspondence and the integrity of the media-shifted tracks.

33.     The policy also requires disc owners to maintain ownership and possession of the discs and to put discs from which content has been media-shifted "on the shelf," i.e., out of use of any type while the content is media-shifted.

34.     Unfortunately, easy electronic duplication of media-shifted tracks has resulted in the widespread distribution of media-shifted karaoke tracks unaccompanied by the ownership of any discs at all.

35.     This distribution allows karaoke accompaniment track users to gain the benefit of what appear to be Slep-Tone karaoke tracks without paying for original discs.

36.     Karaoke accompaniment track users have used the available technology to place the duplicated contents of one purchased disc on two or more computer systems for simultaneous use; to place the duplicated contents of their patrons' discs on their own computer hard drives at a show; to "swap" song files with other users; to obtain and share karaoke tracks via file-sharing sites and torrents; to purchase computer hard drives that were pre-loaded with duplicates of karaoke tracks; and to sell any original media they might have owned in the secondary market once they have media-shifted.

37.     None of these activities are conducted with PEP's authorization, and none of these activities are accompanied by any sort of payment to PEP.

38.     Instead, these activities have driven the demand for original discs down to uneconomically feasible levels, because it has become relatively easy to obtain illicitly, for free or at a nominal cost, products that if legitimate would cost tens of thousands of dollars when purchased at retail.

39.     Prior to instituting this lawsuit, PEP sent a letter to Defendant via UPS on October 28, 2015. To date, Defendant has not provided a response. Attached as Exhibit "A" is a copy of PEP's letter to Defendant.

## THE RIGHTS OF THE PLAINTIFF

40.     PEP is the owner of U.S. Trademark Registration No. 1,923,448, issued October 3, 1995, and properly renewed and maintained, for the trademark SOUND CHOICE, for "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions." Attached as Exhibit "B" is a copy of the 'Registration No. '448. Registration No. '448 is incontestable.

41.     PEP is the owner of U.S. Trademark Registration No. 2,000,725, issued September 17, 1996, and properly renewed and maintained, for a display trademark as follows:



for "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions." Attached as Exhibit "C" is a copy of Registration No. '725.   Registration No. '725 is incontestable.

42.     PEP is the owner of U.S. Service Mark Registration No. 4,099,045, issued February 14, 2012, for the trademark SOUND CHOICE, for "conducting entertainment exhibitions in the nature of karaoke shows." Attached as Exhibit "D" is a copy of Registration No. '045.

43.     PEP is the owner of U.S. Service Mark Registration No. 4,099,052, issued February 14, 2012, for the same display trademark as in the preceding paragraph, for "conducting entertainment exhibitions in the nature of karaoke shows." Attached as Exhibit "E" is a copy of Registration No. '052.

44.     PEP has recorded its ownership of Registration Nos. '448, '725, '045, and '052 with the United States Patent and Trademark Office.  Attached as Exhibit "F" is a copy of the assignment document.  Attached as Exhibit "G" is a copy of the United States Patent and Trademark Office Notice of Recordation.

45.     PEP and its predecessor have, for the entire time its marks identified above ("the Sound Choice Marks") have been federally registered, provided the public, including the Defendant, with notice of those federal registrations through the consistent display of the symbol ® with its marks as used.

46.     Principally, the Sound Choice Marks are indicators of PEP as the origin of karaoke accompaniment tracks, meaning that those marks indicate that the tracks to which they are applied were made and distributed by PEP or at its direction and under its control.

47.     PEP is the owner of distinctive and protectable trade dress associated with its graphical displays ("the Trade Dress").  This distinctive and protectable trade dress includes, at a minimum, (1) the use of a particular typeface, style, and visual arrangement in displaying the

lyrics; (2) the Sound Choice Marks; and (3) the use of particular styles in displaying entry cues for singers, namely a series of vanishing rectangles to indicate the cue.

48.     PEP and its predecessor have used its trade dress continuously and substantially exclusively for a period of decades.

49.     The individual and collected elements of the Trade Dress have acquired secondary meaning as an indicator of PEP and its predecessor as a source, effectively functioning as a visual trademark.

50.     The aforementioned trade dress serves to distinguish PEP's tracks from the tracks of their competitors, such that persons who are even minimally frequent consumers of karaoke entertainment services such as those provided by this Defendant are capable of identifying a particular karaoke track as originating with PEP simply by examining the Trade Dress or any significant portion thereof, whether or not the Sound Choice Marks are also displayed.

51.     The elements of the Trade Dress represent specific design choices by the Slep-Tone; they are but three of many ways to convey the information necessary to permit a karaoke singer to be appropriately supported in his or her performance.

52.     No competitor of PEP is required to use any element of the Trade Dress to accomplish the lyric cueing, and indeed all of PEP's known competitors are known to use other trade dress in accomplishing the lyric cueing.

## ACTIVITIES OF THE DEFENDANT

53.     Defendant provides karaoke entertainment at its venue Good Time Charlie's Pub in Tampa, Florida.

54.     On information and belief, Defendant provides karaoke shows seven days a week at the aforesaid venue.

55.     On information and belief, Defendant has utilized several individuals to facilitate the karaoke shows.

56.     On information and belief, in order to provide services, rather than using original karaoke discs that it possesses (if it indeed possesses such discs), Defendant relies upon one or more computer hard drives that store files representing karaoke accompaniment tracks.

57.     On information and belief, Defendant relies upon at least one such computer hard drive described in paragraph 54 herein.

58.     On information and belief, Defendant created, or directed another to create, or otherwise acquired from a third party the files that are stored on its computer hard drive(s).

59.     Defendant did not pay any royalties or fees to PEP for the privilege of displaying the Sound Choice Marks during the karaoke shows.

60.     On information and belief, Defendant does not maintain a 1:1 correspondence relationship between its hard drives and original discs it has lawfully acquired, if it indeed has any original discs.

61.     PEP did not authorize, cause, control, or know about the creation of the files stored on the Defendant's computer hard drives at the time those files were so stored.

62.     Rather, on information and belief, the files were created by or at the behest of the Defendant, or by a third party unknown to PEP.  The party who created the files is the "origin" of the files for purposes of the Trademark Act.

63.     On information and belief, many of the files stored on the Defendant's computer hard drives are representative of karaoke tracks originally created by PEP and its predecessor and are marked with the Sound Choice Marks.

64.     When played as intended using appropriate software, those files cause the Sound Choice Marks and the Trade Dress to be displayed as part of the associated video component of the karaoke tracks they represent.  As a result, when the tracks are used, the Sound Choice trademarks are broadcast or published to the general public or specific market segment to advertise the Defendant's goods, products or services for the purpose of attracting customers or supporters.

65.     PEP did not authorize the Defendant to create or use karaoke accompaniment tracks or computer files representative of karaoke accompaniment tracks that bear the Sound Choice Marks or the Trade Dress.

66.     As such, the placement of the Sound Choice Marks and the Trade Dress upon the Defendant's self-created computer files is a false designation of the origin of those computer files.

67.     At all times relevant to the causes of action stated herein, the Defendant has known that the creation and use of karaoke accompaniment tracks or computer files representative of karaoke accompaniment tracks that bear the Sound Choice Marks and/or the Trade Dress is not authorized.

68.     Defendant's files, which function as karaoke accompaniment tracks, are also counterfeits of genuine Sound Choice-branded tracks.

69.     A patron or unwitting customer of the Defendant, when confronted with the display of the Sound Choice Marks and the Trade Dress at one of the Defendant's shows, is likely to be confused into believing, falsely, that PEP created the tracks in use or authorized their creation.

70.     Defendant has also advertised the availability of karaoke shows at its facility and, through the display of the Sound Choice Marks while the services were being provided, falsely advertised its use of genuine Sound Choice karaoke tracks.

71.     On information and belief, Defendant's activities are not isolated or sporadic occurrences, but are instead regular activities which have been undertaken daily for several years.

72.     Defendant's use of the computer files representative of karaoke accompaniment tracks is commercial in nature because it entices paying patrons to come to their establishment and purchase food and beverages.

73.     Additionally, even if a particular counterfeit track is not played at a given show, the act of making that track available for play at a show is a commercial act for which Defendant is compensated and which inures to its benefit.

74.     Defendant's piracy of accompaniment tracks is not limited to PEP's tracks, but extends to the piracy of numerous other manufacturers' tracks as well, on the same terms as above.

75.     PEP informed Defendant of the infringing and counterfeit character of Defendant's karaoke accompaniment tracks.

76.     As a result of PEP's efforts, Defendant has actual knowledge of the infringing and counterfeit nature of their karaoke materials.

77.     Despite that knowledge, Defendant refused to terminate their services.

78.     Despite that knowledge, Defendant continued to receive a financial benefit from the provision of infringing karaoke services at their establishment through the attraction of paying patrons to their establishment.

## DAMAGES

79.     Defendant's unauthorized use of PEP's trademarks has damaged PEP.

80.     Defendant damaged PEP in an amount to be proven at trial but not less than $25,000.00 for each karaoke system they own or operate and which contains karaoke tracks that infringe the Sound Choice Marks as detailed above, based upon their foregone purchases of original media.

81.     Defendant enjoys revenues attributable in substantial part to its use of counterfeit Sound Choice-branded karaoke tracks to provide karaoke services for money.

82.     Defendant's illicit activities have also allowed it to compete unfairly against PEP's legitimate customers by lowering its cost of doing business through piracy of the music materials it uses.

83.     Those illicit activities exerted illegitimate and unfair pressure upon the market for karaoke services in the areas in which the Defendant operate by helping to crowd higher-cost but legitimate operators out of the market.

84.     Defendant's acts deprived PEP of revenue by discouraging legitimate operators from investing in legitimate Sound Choice-branded products.

## FIRST CLAIM FOR RELIEF
### TRADEMARK AND TRADE DRESS INFRINGEMENT (Lanham Act)

85.     PEP repeats and incorporates by reference herein its allegations contained in paragraphs 1 through 84 above.

86.     Defendant used and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress in connection with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress, and by

displaying the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress during the provision of those services.

87.     Use of the Sound Choice Marks and the Trade Dress by Defendant were "in commerce" within the meaning of the Trademark Act of 1946 as amended.

88.     PEP did not license Defendant to manufacture or acquire reproductions, counterfeits, or copies of, or to use, the Sound Choice Marks or the Trade Dress in connection with the provision of their services.

89.     Use of the Sound Choice Marks and the Trade Dress by Defendant in this manner is likely to cause confusion, or to cause mistake, or to deceive its customers and patrons into believing that its services are being provided with the authorization of PEP and that its music libraries contain bona fide Sound Choice accompaniment tracks.

90.     On information and belief, the acts of Defendant were willful, knowing, and intentional.

91.     PEP has been damaged by these infringing activities.

92.     Unless enjoined by the Court, the infringing activities as described above will continue unabated and will continue to cause harm to PEP.

## SECOND CLAIM FOR RELIEF
### UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)
### AGAINST DEFENDANT GOODTIME

93.     PEP repeats and incorporates by reference herein its allegations contained in paragraphs 1 through 84 above.

94.     On each occasion Defendant caused or permitted an unauthorized counterfeit duplicate of a PEP accompaniment track to be played during a karaoke show at a given

establishment, the Sound Choice Marks and the Trade Dress were displayed in connection with the Defendant's karaoke services.

95.     The display of the Sound Choice Marks and the Trade Dress is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that PEP manufactured the karaoke accompaniment tracks in use at the establishment or otherwise sponsored or approved the Defendant's services and commercial activities.

96.     The display of the Sound Choice Marks and the Trade Dress is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by PEP and purchased or otherwise licensed by Defendant.

97.     Defendant's use of PEP's marks and trade dress in this fashion or in a more appropriate fashion would have inured to the benefit of PEP if Defendant had legitimately acquired bona fide original media instead of counterfeiting them or acquiring counterfeit copies, in that PEP would have received revenue from such sales.

98.     Because PEP has been denied this revenue, it has been damaged by Defendant's uses.

99.     On each occasion when Defendant caused or permitted an accompaniment track pirated from a manufacturer other than PEP to be played during a karaoke show, the words, names, and symbols of the other manufacturer were displayed in connection with the Defendant's karaoke services.

100.    Upon information and belief, Defendant's use of those words, names, and symbols falsely designates the other manufacturer as the origin of the pirated track, when in fact Defendant or an upstream but unauthorized provider of the track was the origin of that track.

101.    The display of these false designations of origin is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the pirated tracks are legitimate, authorized, and authentic materials that Defendant acquired in a legitimate manner.

102.    The display of the false designations of origin is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by those manufacturers and purchased by Defendant.

103.    Defendant's use of the false designations of origin in this fashion damages PEP by enabling Defendant to provide karaoke services at a lower cost than persons who acquire those materials legitimately, including PEP's legitimate customers, can provide or obtain them.

104.    The consequential denial of revenue from a legitimate market for PEP's customers' services prevents PEP's customers from making purchases of material from PEP and is thus a denial of revenue to PEP.

105.    Because PEP has been denied this revenue, it has been damaged by Defendant's false designations of origin relating to other manufacturers.

106.    Unless enjoined by the Court, the Defendant's unfair competition activities as described above will continue unabated and will continue to cause harm to PEP.

## THIRD CLAIM FOR RELIEF
### VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (FDUTPA) Fla. Stat. §501.201, *et seq.* AGAINST DEFENDANT GOODTIME

107.    PEP repeats and incorporates by reference herein its allegations contained in paragraphs 1 through 84 above.

108.    Defendant used and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress in connection with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress, and by displaying the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress during the provision of those services.

109.    Defendant's acts of infringement occurred during the conduct of trade or commerce, from which Goodtime derived an economic benefit.

110.    Defendant's acts of infringement constitute unfair or deceptive acts or practices within the meaning of Fla. Stat. § 501.204(1) (2009).

111.    Defendant's acts of infringement cause likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by PEP.

112.    As a direct and proximate result of each of Defendant's acts of infringement PEP has suffered a pecuniary loss, including the loss of revenue associated with sales or distribution of compact discs to karaoke jockeys, commensurate with the demand for the contents of those discs, which revenue would have been received but for Defendant's acts in creating or acquiring counterfeits of Sound Choice-branded accompaniment tracks.

113.    Unless enjoined by the Court, Defendant's unfair competition activities as described above will continue unabated and will continue to cause harm to PEP.

114.    PEP is entitled to its attorneys' fees and costs pursuant to Fla. Stat. §501.2105.

**FOURTH CLAIM FOR RELIEF**
**COMMON LAW UNFAIR COMPETITION**
**AGAINST DEFENDANT GOODTIME**

115.    PEP repeats and incorporates by reference herein its allegations contained in paragraphs 1 through 84 above.

116.    Defendant used and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress in connection with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress, and by displaying the reproduction, counterfeit, or copy of the Sound Choice Marks or the Trade Dress during the provision of those services.

117.    Defendant's use of the Sound Choice Marks and the Trade Dress is business conduct which is contrary to honest practice in commercial matters.

118.    PEP did not license Defendant to make, acquire, or use reproductions, counterfeits, or copies, or to use the Sound Choice Marks or the Trade Dress in connection with the services provided at its commercial establishment.

119.    Use of the Sound Choice Marks and the Trade Dress in the manner attributable to the Defendant is likely to cause confusion, or to cause mistake, or to deceive customers at the venues in which the Defendant performs into falsely believing that the services those customers are receiving are being provided with the authorization of the PEP using bona fide, legitimate, authorized karaoke accompaniment tracks.

120.    Defendant's acts were willful and knowing.

121.    PEP has been damaged by the infringing activities of Defendant.

122.    Unless enjoined by the Court, Defendant's infringing activities as described above will continue unabated and will continue to cause harm to PEP.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, PEP, prays for judgment against the Defendant, and that the Court:

A.      Find that Defendant committed acts of infringement, including but not limited to counterfeiting, of the federally registered Sound Choice Marks and of the Trade Dress;

B.      Find that Defendant engaged in unfair competition detrimental to PEP in violation of 15 U.S.C. § 1125(a);

C.      Enter judgment against Defendant and in favor of PEP on all applicable counts;

D.      Find the Defendant's activities were in all respects conducted willfully and for profit;

E.      Award to PEP Defendant's profits and the damages sustained by PEP because of Defendant's conduct in infringing the Sound Choice Marks, the Trade Dress, or both, or, in the alternative, statutory damages per trademark infringed by counterfeiting in an amount up to Two Million and no/100 Dollars ($2,000,000.00) per mark infringed and in any event in an amount not less than Twenty Five Thousand and no/100 Dollars ($25,000.00) for each karaoke system operated by Defendant, and not less than Fifty Thousand and no/100 Dollars ($50,000.00) for each establishment in which the infringement occurred;

F.      Award to PEP Defendant's profits and the damages sustained by PEP because of the Defendant's acts of unfair competition under 15 U.S.C. § 1125(a), and in any event in an

amount not less than $25,000.00 for each karaoke system operated by Defendant, and not less than $50,000.00 for each establishment in which the infringement occurred;

G.     Award to PEP treble, punitive, or otherwise enhanced damages, as available, for Defendant's acts of willful infringement;

H.     Order all computer disks, drives, or other media belonging to Defendant, which media contain counterfeits of PEP's marks, or of marks belonging to other manufacturers, to be delivered up for destruction;

I.     Grant PEP preliminary and permanent injunctive relief against further infringement of the Sound Choice Marks by Defendant;

J.     Grant PEP preliminary and permanent injunctive relief against further false designations of origin by Defendant with respect to words, names, and symbols associated with other manufacturers;

K.     Award PEP its costs suit and attorney fees, to the extent not awarded above; and

L.     Grant PEP such other and further relief as justice may require.

### JURY DEMAND

PEP demands trial by jury on all issues so triable.

Date: December 11, 2015                                     Respectfully submitted,

/s/_____
Woodrow H. Pollack
Trial Counsel
Florida Bar No. 026802
**GRAYROBINSON, P.A.**
401 East Jackson Street, Suite 2700
Tampa, Florida  33602
(813) 273-5000
(813) 273-5145 (facsimile)
woodrow.pollack@gray-robinson.com
*Attorney for Plaintiff*

# UNITED STATES PATENT AND TRADEMARK OFFICE

UNDER SECRETARY OF COMMERCE FOR INTELLECTUAL PROPERTY AND
DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE

FEBRUARY 13, 2015

PTAS

JAMES HARRINGTON
12245 NATIONS FORD RD STE 506
PINEVILLE, NC 28134

# 900315536

UNITED STATES PATENT AND TRADEMARK OFFICE
NOTICE OF RECORDATION OF ASSIGNMENT DOCUMENT

THE ENCLOSED DOCUMENT HAS BEEN RECORDED BY THE ASSIGNMENT RECORDATION BRANCH OF THE U.S. PATENT AND TRADEMARK OFFICE. A COMPLETE COPY IS AVAILABLE AT THE ASSIGNMENT SEARCH ROOM ON THE REEL AND FRAME NUMBER REFERENCED BELOW.

PLEASE REVIEW ALL INFORMATION CONTAINED ON THIS NOTICE. THE INFORMATION CONTAINED ON THIS RECORDATION NOTICE REFLECTS THE DATA PRESENT IN THE PATENT AND TRADEMARK ASSIGNMENT SYSTEM. IF YOU SHOULD FIND ANY ERRORS OR HAVE QUESTIONS CONCERNING THIS NOTICE, YOU MAY CONTACT THE ASSIGNMENT RECORDATION BRANCH AT 571-272-3350. PLEASE SEND REQUEST FOR CORRECTION TO: U.S. PATENT AND TRADEMARK OFFICE, MAIL STOP: ASSIGNMENT RECORDATION BRANCH, P.O. BOX 1450, ALEXANDRIA, VA 22313.

RECORDATION DATE: 02/11/2015          REEL/FRAME: 5458/0694
                                      NUMBER OF PAGES: 3

BRIEF: ASSIGNS THE ENTIRE INTEREST

ASSIGNOR:
    SLEP-TONE ENTERTAINMENT CORPORATION   DOC DATE: 02/10/2015
                                          CITIZENSHIP: NORTH CAROLINA
                                          ENTITY: CORPORATION

ASSIGNEE:
    PHOENIX ENTERTAINMENT PARTNERS, LLC   CITIZENSHIP: NORTH CAROLINA
                                          ENTITY: LIMITED LIABILITY COMPANY

    12245 NATIONS FORD RD STE 505
    PINEVILLE, NORTH CAROLINA 28134

SERIAL NUMBER: 74561912               FILING DATE: 08/17/1994
REGISTRATION NUMBER: 1923448          REGISTRATION DATE: 10/03/1995
MARK: SOUND CHOICE
DRAWING TYPE: TYPESET WORD(S) /LETTER(S) /NUMBER(S)

SERIAL NUMBER: 74627124               FILING DATE: 01/30/1995
REGISTRATION NUMBER: 2000725          REGISTRATION DATE: 09/17/1996
MARK: SOUND CHOICE
DRAWING TYPE: AN ILLUSTRATION DRAWING WHICH INCLUDES WORD(S)/ LETTER(S)
              /NUMBER(S)

```
SERIAL NUMBER: 85364445              FILING DATE: 07/06/2011
REGISTRATION NUMBER: 4099045         REGISTRATION DATE: 02/14/2012
MARK: SOUND CHOICE
DRAWING TYPE: STANDARD CHARACTER MARK


SERIAL NUMBER: 85364555              FILING DATE: 07/06/2011
REGISTRATION NUMBER: 4099052         REGISTRATION DATE: 02/14/2012
MARK: SOUND CHOICE
DRAWING TYPE: AN ILLUSTRATION DRAWING WHICH INCLUDES WORD(S)/ LETTER(S)
             /NUMBER(S)



ASSIGNMENT RECORDATION BRANCH
PUBLIC RECORDS DIVISION
```

EXHIBIT A



October 28, 2015

Martha J. Howell, Agent
Goodtime Charlies Inc
Goodtime Charlie's Pub
4030 W Waters Ave
Tampa, FL 33614

**RE:     Karaoke in your establishment**

To Whom It May Concern:

   Phoenix Entertainment Partners, LLC, is the owner of the popular karaoke brands SOUND CHOICE® and CHARTBUSTER KARAOKE®. Our products are re-recorded versions of popular songs, minus the lead vocals, and they are commonly used in karaoke shows in venues just like yours around the United States. Our brands have been the two most popular karaoke brands in America for more than 25 years. If you've been to a karaoke show, you've probably seen our logos displayed on the screen:



   We are currently engaged in a nationwide campaign to educate the karaoke-consuming public about piracy of SOUND CHOICE® and CHARTBUSTER KARAOKE® tracks and to enforce Phoenix's intellectual property rights. Even though karaoke entertainment is more popular than ever, karaoke piracy has devastated the industry; every karaoke music label has scaled down or eliminated new production, and many have gone out of business.

   As part of that campaign, Phoenix and its attorneys have been filing lawsuits around the country—including some in your state—against karaoke entertainment companies and individuals who provide karaoke services to bars, restaurants, and other venues. In these lawsuits, a hosting company or individual is accused of using unauthorized copies of SOUND CHOICE®-branded or CHARTBUSTER KARAOKE®-branded tracks, illegally acquired, in order to provide karaoke services to commercial establishments. This kind of activity is referred to in the law as trademark counterfeiting, which is a serious offense.

   When you hire karaoke operators to provide services in your establishment, you have an obligation to ensure that your operator does not infringe our intellectual property rights. Our investigations have shown that more than 90% of karaoke operators have infringed our trademarks. If you allow an operator to do so in your establishment, you and your company can also be held liable for the infringement—even if the provider is an independent contractor. The liability is not much different from what you would incur if you bought stolen food or alcohol to serve in your bar or restaurant.

For venue owners who ignore these obligations, the consequences can be dire: significant money judgments, injunctions, and attorney fees have been awarded against venue owners who became aware of the possibility of infringement by their contractors and did not stop it from occurring.

For that reason, we offer tools to assist you in determining whether the karaoke operator you hire is or is not infringing our intellectual property rights. The most important of these tools is the Verified Compliance Safe Harbor Program. Provided that a venue registers for the program, requires that its karaoke operators provide information to us about their operations (thus allowing us to determine whether infringement is occurring), and agrees to discontinue using the services of operators who infringe our intellectual property rights, we will agree not to bring a lawsuit against that venue. We've included a brochure with this letter that has more information about Safe Harbor, or you can visit our Safe Harbor website at http://scsafeharbor.com for more information and to register for the program. The Safe Harbor program is 100% free to venues and operators.

Please do not delay in registering your venue for this program and completing the requirements, because our efforts in your area are ongoing, and lawsuits could be filed at any time. It is not our practice to give additional warnings before we file a lawsuit.

You should also be aware, more generally, that a karaoke operator who uses SOUND CHOICE® karaoke tracks from any source other than original compact discs—that means from a hard drive, a laptop, or other non-original source, or by downloading tracks or streaming them from a website—is engaged in infringement of our intellectual property rights unless that operator has our permission to do so. You can generally determine whether an operator has our permission by checking the list of Sound Choice Certified KJs on our website at https://pep.rocks/cert. However, some operators who have our permission may not be in that list. An operator who does have our permission will be able to produce a certificate or, at a minimum, a certificate number, that you can check by calling us at 800-788-4487 during our normal business hours, 8:30 a.m. to 5:00 p.m. Eastern.

There are fewer restrictions on CHARTBUSTER KARAOKE® tracks, because those tracks have been sold in many different formats. However, we have found that most karaoke operators who use those tracks do not have the original media— compact discs, SD cards, or branded hard drives— associated with them. It is important that you demand that your karaoke operator show you his or her original media.

Please also be advised that any licenses you may purchase from ASCAP, BMI, or SESAC do not cover our rights in connection with this kind of activity.

We do wish to thank you in advance for your support of the legal karaoke industry. We hope you will take the information we've provided to heart and take the steps necessary to ensure that your operators do not infringe our intellectual property rights. Your cooperation is an essential part of making karaoke possible for the future.

Sincerely yours,

Phoenix Entertainment Partners, LLC

Kurt J. Slep
President
Phoenix Entertainment Partners, LLC
12245 Nations Ford Rd., Suite 505
Pineville, NC 28134
704-588-7778, Ext. 1131
kurts@phxep.com

Int. Cl.: 9

Prior U.S. Cls.: 21, 23, 26, 36 and 38

**Reg. No. 1,923,448**

# United States Patent and Trademark Office

Registered Oct. 3, 1995

## TRADEMARK
### PRINCIPAL REGISTER

## SOUND CHOICE

SLEP-TONE ENTERTAINMENT CORPORA-
TION (NORTH CAROLINA CORPORATION)
SUITE 305
600 TOWNE CENTRE BLVD.
PINEVILLE, NC 28134

FOR: PRE-RECORDED MAGNETIC AUDIO
CASSETTE TAPES AND COMPACT DISCS
CONTAINING MUSICAL COMPOSITIONS AND
COMPACT DISCS CONTAINING VIDEO RE-
LATED TO MUSICAL COMPOSITIONS, IN
CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

FIRST USE 2–21–1987; IN COMMERCE
2–21–1987.

SER. NO. 74–561,912, FILED 8–17–1994.

CYNTHIA GREER, EXAMINING ATTORNEY

EXHIBIT C

Int. Cl.: 9

Prior U.S. Cls.: 21, 23, 26, 36 and 38

Reg. No. 2,000,725

**United States Patent and Trademark Office**

Registered Sep. 17, 1996

Corrected

OG Date Sep. 23, 1997

## TRADEMARK
## PRINCIPAL REGISTER



SLEP-TONE ENTERTAINMENT CORPO-
RATION (NORTH CAROLINA CORPO-
RATION)
600 TOWNE CENTRE BOULEVARD,
SUITE 305
PINEVILLE, NC 28134

FOR: PRE-RECORDED MAGNETIC
AUDIO CASSETTE TAPES AND COM-
PACT DISCS CONTAINING MUSICAL
COMPOSITIONS AND COMPACT DISCS
CONTAINING VIDEO RELATED TO
MUSICAL COMPOSITIONS, IN CLASS 9
(U.S. CLS. 21, 23, 26, 36 AND 38).

FIRST USE 2-21-1987; IN COMMERCE
2-21-1987.

SER. NO. 74-627,124, FILED 1-30-1995.

*In testimony whereof I have hereunto set my hand
and caused the seal of The Patent and Trademark
Office to be affixed on Sep. 23, 1997.*

COMMISSIONER OF PATENTS AND TRADEMARKS

EXHIBIT D



# United States of America

## United States Patent and Trademark Office

# SOUND CHOICE

**Reg. No. 4,099,045**

**Registered Feb. 14, 2012**

**Int. Cl.: 41**

**SERVICE MARK**

**PRINCIPAL REGISTER**

SLEP-TONE ENTERTAINMENT CORPORATION (NORTH CAROLINA CORPORATION)
14100 SOUTH LAKES DR
CHARLOTTE, NC 28273

FOR: CONDUCTING ENTERTAINMENT EXHIBITIONS IN THE NATURE OF KARAOKE SHOWS, IN CLASS 41 (U.S. CLS. 100, 101 AND 107).

FIRST USE 7-1-1987; IN COMMERCE 7-21-2010.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NOS. 1,923,448, 2,000,725, AND 2,026,912.

SER. NO. 85-364,445, FILED 7-6-2011.

DANIEL CAPSHAW, EXAMINING ATTORNEY



*David J. Kappos*

Director of the United States Patent and Trademark Office

EXHIBIT D

---

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL
TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE
DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

---

**Requirements in the First Ten Years***
**What and When to File:**

> ***First Filing Deadline:*** You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. *See* 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

> ***Second Filing Deadline:*** You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between the 9th and 10th years after the registration date.* *See* 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

> You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

---

**The United States Patent and Trademark Office (USPTO) will NOT send you any future notice or
reminder of these filing requirements.**

---

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the USPTO. The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. *See* 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. *See* 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE:  Fees and requirements for maintaining registrations are subject to change.  Please check the USPTO website for further information.  With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

EXHIBIT E

# United States of America
## United States Patent and Trademark Office



**Reg. No. 4,099,052**

**Registered Feb. 14, 2012**

**Int. Cl.: 41**

**SERVICE MARK**

**PRINCIPAL REGISTER**

SLEP-TONE ENTERTAINMENT CORPORATION (NORTH CAROLINA CORPORATION)
14100 SOUTH LAKES DR
CHARLOTTE, NC 28273

FOR: CONDUCTING ENTERTAINMENT EXHIBITIONS IN THE NATURE OF KARAOKE SHOWS, IN CLASS 41 (U.S. CLS. 100, 101 AND 107).

FIRST USE 7-1-1987; IN COMMERCE 7-21-2010.

THE MARK CONSISTS OF THE WORDS "SOUND CHOICE" STYLIZED AND SUPERIMPOSED OVER A REPRESENTATION OF A MUSICAL STAFF.

SER. NO. 85-364,555, FILED 7-6-2011.

DANIEL CAPSHAW, EXAMINING ATTORNEY



*David J. Kappos*

Director of the United States Patent and Trademark Office

---

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL
TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE
DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

---

**Requirements in the First Ten Years\***
**What and When to File:**

> *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. *See* 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

> *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between the 9th and 10th years after the registration date.\*
> *See* 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods\***
**What and When to File:**

> You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.\*

**Grace Period Filings\***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

---

**The United States Patent and Trademark Office (USPTO) will NOT send you any future notice or
reminder of these filing requirements.**

---

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the USPTO. The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. *See* 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. *See* 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

EXHIBIT F

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
## TRADEMARK ASSIGNMENT

For the sum of TEN DOLLARS ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged,

### SLEP-TONE ENTERTAINMENT CORPORATION
(a North Carolina corporation)

does hereby assign unto

### PHOENIX ENTERTAINMENT PARTNERS, LLC
(a North Carolina limited liability company)
12245 Nations Ford Road, Suite 505
Pineville, NC 28134-8444

the entire right, title, and interest in and to the following registered trademarks and service marks:

| Reg. No. | Reg. Date | Last Renewal | Mark |
|----------|-----------|--------------|------|
| 1,923,448 | 10/3/1995 | 12/7/2004 | SOUND CHOICE |
| 2,000,725 | 9/17/1996 | 11/29/2006 | SOUND CHOICE & Design |
| 4,099,045 | 2/14/2012 | n/a | SOUND CHOICE |
| 4,099,052 | 2/14/2012 | n/a | SOUND CHOICE & Design |

together with the business goodwill symbolized thereby and with all rights to sue and to recover damages and/or profits for past infringements, effective from 12:01 a.m. on February 10, 2015.

### SLEP-TONE ENTERTAINMENT CORPORATION

BY _____       _2/10/2015_

Kurt J. Slep, President                              Date

---

STATE OF NORTH CAROLINA       }
                              }          NOTARIZATION
COUNTY OF _Mecklenburg_       }

Sworn and subscribed to before me by Kurt J. Slep this the _10_ day of _Feb_____, 201_5_.

_Angela Walther._
Notary Public

_Angela Walther_
Printed Name

My commission expires _August 4, 2017_

ANGELA WALTHER
NOTARY PUBLIC
Mecklenburg County, North Carolina

The foregoing assignment is hereby acknowledged and accepted.

**PHOENIX ENTERTAINMENT PARTNERS, LLC**

BY _____     _2/10/2015_____

James M. Harrington, VP, Sales & Marketing        Date